# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| HAKEEM JACOBS, Individually and on Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) | Case No. |
| v. ) ) | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |
| ARC LOGISTICS PARTNERS LP, VINCENT T. CUBBAGE, BARRY L. ZUBROW, SIDNEY L. TASSIN, GARY G. WHITE, ERIC J. SCHEYER, EDWARD P. RUSSELL and JOHN PUGH, ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. ) ) | |

Plaintiff Hakeem Jacobs ("Plaintiff"), by and through his undersigned counsel, brings this class action on behalf of himself and all other similarly situated public common unitholders of Arc Logistics LP ("Arc Logistics" or the "Company") against the Company, Vincent T. Cubbage, Barry L. Zubrow, Sidney L. Tassin, Gary G. White, Eric J. Scheyer, Edward P. Russell, and John Pugh, the members of Arc Logistics GP LLC's[1] board of directors (collectively referred to as the "Board" or the "Individual Defendants"), for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S,C. §§78n(a) and 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with acquisition of Arc Logistics by Zenith Energy U.S., L.P ("Zenith") through a merger transaction as alleged in detail herein ("Proposed Transaction"). Plaintiff alleges the

---

[1] Arc Logistics GP LLC is the general partner of Arc Logistics. Under the First Amended and Restated Agreement of Limited Partnership Arc Logistics Partners LP, Arc Logistics is controlled by Arc Logistics GP, who exercises its authority through the Arc Logistics GP board of directors.

following based upon personal knowledge as to himself, and upon information and belief, including the investigation of Counsel, as to all other matters.

## NATURE OF THE ACTION

1.     On August 29, 2017, Arc Logistics, Lightfoot Capital Partners GP LLC ("LCP GP"), and Lightfoot Capital Partners, LP ("LCP LP", and together with LCP GP, "Lightfoot") announced that they had entered into a Purchase Agreement and Plan of Merger ("Merger Agreement") with Zenith, under which Zenith will acquire Arc Logistics GP LLC ("Arc GP"), the general partner of Arc Logistics, and all outstanding Arc Logistics common units.  Pursuant to the terms of the Merger Agreement, Arc Logistics common unitholders, other than those held by Lightfoot, will receive $16.50 in cash for each Arc Logistic common unit they own ("Merger Consideration").

2.     Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading Schedule 14A Definitive Proxy Statement (the "Proxy Statement") to be filed with the SEC on September 26, 2017.  The Arc Logistic Board recommends in the Proxy Statement that Arc Logistics common unitholders vote in favor of approving Proposed Transaction at the special meeting of common unitholders at an undetermined date in the near future and agree to exchange their common units pursuant to the terms of the Merger Agreement based among other things on internal and external factors examined by the Board to make its recommendation and an opinion rendered by the Arc Logistics GP's conflicts committee's (the "GP Conflicts Committee) financial advisor, Tudor Pickering Holt & Co. Advisors LP ("TPH").

3.     The Merger Consideration and the process by which Defendants agreed to consummate the Proposed Transaction are fundamentally unfair to holders of Arc Logistics's

common units.  Notably, the Merger Consideration represents a substantial loss compared to the Company's 52-week high closing price of $17.40.

4.      As discussed further below, little real effort was made to engage in a true market check to find other parties interested in a strategic transaction with the Company to maximize value for Arc Logistics common unitholders.  The inadequate Merger Consideration reflects the lack of effort as it does not reflect the value of the Company or the fair value of Arc Logistics common units.

5.      For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from consummating the Proposed Transaction or in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations Sections 14(a) and 20(a) of the Exchange Act.

<div align="center">

**PARTIES**

</div>

6.      Plaintiff is and has been at all relevant times, a holder of Arc Logistics common units.

7.      Defendant Arc Logistics is a master limited partnership that owns and operates terminalling, storage, transloading, and pipeline assets as an independent logistics provider.  Its principal office at 725 Fifth Avenue 19th Floor, New York, New York 10022.  It is organized under Delaware state law.  Arc Logistics common units trade on the NYSE exchange under the symbol "ARCX".

8.      Defendant Vincent T. Cubbage serves as the Chief Executive Officer of the Company and has served the Chairman of the Board since 2013.

9.      Defendant Barry L. Zubrow has served on the Board since 2013.

10.     Defendant Sidney L. Tassin has served on the Board since 2013, and also served on the GP Conflicts Committee.

11.     Defendant Gary G. White has served on the Board since 2014, and also served on the GP Conflicts Committee.

12.     Defendant Eric J. Scheyer has served on the Board since 2013.

13.     Defendant Edward P. Russell has served on the Board since 2013.

14.     Defendant John Pugh has served on the Board since 2017.

15.     The parties in paragraphs 8-14 are referred to herein as the "Individual Defendants" and/or the "Board," collectively with Arc Logistics the "Defendants."

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

17.     This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.  Arc Logistics is incorporated in Delaware and is headquartered in this District.  Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Arc Logistics common units (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

20.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

21.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of August 2, 2017, there were approximately 19.55 million common units of Arc Logistics issued and outstanding.  All members of the Class may be identified from records maintained by Arc Logistics or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

22.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a)     whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy Statement in violation of Section 14(a), SEC Rule 14a-9 among other SEC rules;

(b)     whether the Individual Defendants may be liable under Section 20(a) of the Exchange Act; and

(c)     whether Plaintiff and the other members of the Class would suffer

irreparable injury were the Proposed Transaction consummated.

23.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.  Plaintiff has retained competent counsel experienced in litigation of this nature.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

25.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### I.     Company Background and the Proposed Transaction

26.     Arc Logistics was founded in 2007 and engages in the terminalling, storage, throughput, and transloading of petroleum products and other liquids.  The Company's energy logistics assets serves various third-party customers, including oil companies, independent refiners, crude oil and petroleum product marketers, distributors, and various industrial manufacturers.  The Company's energy logistics assets consist of 21 terminals in 12 states located in the East Coast, Gulf Coast, Midwest, Rocky Mountains, and West Coast regions of the United States with approximately 7.8 million barrels of crude oil and petroleum product storage capacity; 4 rail transloading facilities with approximately 126,000 barrel per day of throughput capacity; and the liquefied natural gas ("LNG") interest in LNG facility, which has 320,000 cubic meters of LNG storage, 1.5 billion cubic feet per day natural gas sendout capacity, and interconnects to natural gas pipeline networks.

27.    On August 29, 2017, prior to the opening of trading on the NYSE, Arc Logistics issued a press release announcing the Proposed Transaction.  The press release stated, in relevant part:

### Arc Logistics Partners LP Enters Into a Definitive Agreement to be Acquired by Zenith

NEW YORK, August 29, 2017 (GLOBE NEWSWIRE) — Arc Logistics Partners LP (NYSE: ARCX) ("Arc Logistics" or the "Partnership"), Lightfoot Capital Partners GP LLC ("LCP GP") and Lightfoot Capital Partners, LP ("LCP LP", and together with LCP GP, "Lightfoot") announced today that they have entered into a Purchase Agreement and Plan of Merger (the "Merger Agreement") with Zenith Energy U.S., L.P. (together with its affiliates, "Zenith"), a portfolio company of Warburg Pincus, pursuant to which Zenith will acquire Arc Logistics GP LLC ("Arc GP"), the general partner of the Partnership (the "GP Transfer"), and all of the outstanding common units in Arc Logistics (the "Merger" and, together with the GP Transfer, the "Proposed Transaction"). Under the terms of the Merger Agreement, all Arc Logistics common unitholders, other than Lightfoot, will receive $16.50 per common unit in cash for each common unit they own, which represents a premium of approximately 15% to the Partnership's common unit price as of August 28, 2017. LCP LP will receive $14.50 per common unit in cash for the approximately 5.2 million common units held by it, and LCP GP will receive $94.5 million for 100% of the membership interests in Arc GP.

In connection with the Proposed Transaction, the Board of Directors of Arc GP (the "Arc Board") formed a conflicts committee (the "Conflicts Committee") composed of independent directors of the Arc Board to review, evaluate and negotiate the Merger. The Conflicts Committee approved the Merger Agreement and the Merger, determined that the Merger Agreement and the Merger are fair and reasonable to and in the best interests of the Partnership and the holders of common units (other than Lightfoot and its controlling affiliates) and recommended that the Arc Board and holders of common units approve the Merger Agreement and the Merger. Following recommendation and approval from the Conflicts Committee, the Arc Board unanimously approved the Merger Agreement and the Merger and is recommending that all Arc Logistics common unitholders vote in favor of the Merger Agreement and the Merger.

The completion of the Proposed Transaction is subject to a number of closing conditions, including approval by a majority of the outstanding Arc Logistics common unitholders and the expiration of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended. Lightfoot, the owner of Arc GP and approximately 26.8% of the outstanding common units, has executed an agreement to vote in support of the Proposed Transaction. Additionally, the Proposed Transaction is subject to (i) the closing of the purchase by Zenith and Lightfoot from EFS Midstream Holdings LLC of certain of the interests in Arc Terminals Joliet Holdings LLC, which indirectly owns among other things a crude oil unloading facility and a 4-mile crude oil pipeline in Joliet, Illinois, and (ii) the closing of the purchase by Zenith of a 5.5% interest (and, subject to certain conditions, an additional 4.2% interest) in

Gulf LNG Holdings Group, LLC, which owns a liquefied natural gas regasification and storage facility in Pascagoula, Mississippi, from Lightfoot. The Proposed Transaction is not subject to a financing condition and closing is targeted at the end of the fourth quarter of 2017 or early in the first quarter of 2018.

**Advisors**

Citi is acting as financial advisor to LCP GP, LCP LP, Arc GP and the Partnership and Tudor, Pickering, Holt & Co. is acting as financial advisor to the Conflicts Committee. Vinson & Elkins L.L.P. is acting as legal counsel to the Partnership and Baker Botts L.L.P. is acting as legal counsel to the Conflicts Committee.

Barclays and Credit Suisse are acting as financial advisors to Zenith and are providing committed financing for the transaction. Kirkland & Ellis LLP is acting as legal advisors to Zenith U.S.

**About Arc Logistics Partners LP**

Arc Logistics is a fee-based, growth-oriented limited partnership that owns, operates, develops and acquires a diversified portfolio of complementary energy logistics assets. Arc Logistics is principally engaged in the terminalling, storage, throughput and transloading of petroleum products and other liquids. For more information, please visit www.arcxlp.com.[2]

28.    Arc Logistics's common units have demonstrated significant industry value and growth in 2017.  Holders of Arc Logistics common units should be provided with sufficient financial information in the Proxy Statement to make an informed decision regarding the Proposed Transaction.

---

[2] Arc Logistics Partners LP, Current Report (Form 8-K), at Exhibit 99.1 (Press Release of Merger Agreement) (Aug. 29, 2017).



29.    The Merger Consideration being offered to Arc Logistics common unitholders in the Proposed Transaction is unfair and inadequate because, among other things, the intrinsic value of the Company's common units is materially in excess of the amount offered in the Proposed Transaction given the Company's prospects for future growth and earnings.  The Proposed Transaction will deny Class members their right to fully share equitably in the true value of the Company.

30.    For example, Arc Logistics's Q4 2016 Earnings Conference Call, held on March 13, 2017, demonstrated the Company's optimism.  Defendant Cubbage commented on the favorable financial results, stating:

> Arc Logistics Partners is pleased to report strong fourth quarter and record full year 2016 results. Our business achieved several important milestones last year including averaging 158,000 barrels per day in throughput and generating $105.4 million in revenues. Revenues were up 29% last year on 34% higher throughput volumes and adjusted EBITDA for the year was $56.7 million equaling an increase of 29% over 2015's results.
>
> […]
>
> We continue to execute on our independent business strategy and believe this model sets us apart from other terminal companies that we compete with and

those companies that compete with their third-party customers in their facilities.[3]

31.     During the same phone call—Arc Logistics's Q4 2016 Earnings Conference Call, held on March 13, 2017—Brad Oswald, the Company's Chief Financial Officer and Treasurer, also commented on the favorable financial results, stating:

> This afternoon [Arc Logistics] reported financial results for the fourth quarter, full year ended 2016. Our adjusted EBITDA was 13.9 million for the fourth quarter of 2016 as compared to 13.2 million for the same period in 2015 representing a year-over-year increase of 5%. Adjusted EBITDA was 56.7 million for the year ended December 31, 2016 as compared to 44.1 million for the same period in 2015 which is a year-over-year increase of 29%.[4]

32.     Further illustrating that Arc Logistics was poised for growth, Selman Akyol, an investment analyst at Stifel, upgraded ARCX from Hold to Buy on August 9, 2017, and increase his price target more than 35% from "the low target, $13.00, to a new price target of $18.00."[5]

33.     Likewise, Seeking Alpha—a financial analysis website—stated that Arc Logistics is undervalued and highlighted that the Company "has by far the cheapest price/book value in this group, selling at just 74% of book value" when compared to seven of its market competitors, and

---

[3] Arc Logistics Partners' (ARCX) CEO Vince Cubbage on Q4 2016 Results – Earnings Call Transcript, March 13, 2017, *available at* https://seekingalpha.com/article/4054758-arc-logistics-partners-arcx-ceo-vince-cubbage-q4-2016-results-earnings-call-transcript.

[4] *Id.*

[5] *Arc Logistics Partners Got Some Good News*, Markets.co (August 9, 2017), http://www.markets.co/arc-logistics-partners-got-some-good-news/92236/; *Arc Logistics upgraded to Buy from Hold at Stifel*, SEEKING ALPHA (August 9, 2017), https://seekingalpha.com/news/3287598-arc-logistics-upgraded-buy-hold-stifel; *Arc Logistics upgraded to Buy from Hold at Stifel*, THE FLY (August 9, 2017), https://thefly.com/landingPageNews.php?id=2593854&headline=ARCX-Arc-Logistics-rating-change-at-Stifel.

that "[i]t also has the second lowest price/DCF, price/sales and EV/EBITDA, and the highest distribution yield."[6]

34.    Zacks Investment Research evaluated the Company's price-to-earnings ("PE") ratio and price/sales ratios and noted that Arc Logistics "is a solid choice on the value front from multiple angles."  Notably, when analyzing how the Company's PE ratio, Arc Logistics compared "pretty favorably" with the market at large and the Zacks classified Oil and Gas – Production and Pipeline industry, "indicat[ing] that the stock is significantly undervalued right now, compared to its peers."[7]

35.    In sum, the Offer Price appears to inadequately compensate Arc Logistics common unitholders.  Given the Company's strong financial results and growth potential, it appears that $16.50 per common unit is not fair compensation for Arc Logistic's common unitholders.  It is therefore imperative that Arc Logistics common unitholders receive the material information (discussed in detail below) that has been omitted from the Proxy Statement, which is necessary for common unitholders to properly exercise their corporate suffrage rights and make a fully informed decision concerning whether to vote in favor of the Proposed Transaction.

**II.    The Proxy Statement is Materially Incomplete and Misleading.**

36.    On September 26, 2017, Arc Logistics filed the materially incomplete and misleading Proxy Statement with the SEC.  The information contained in the Proxy Statement has thus been disseminated to Arc Logistics common unitholders to solicit their vote in favor of the Proposed Transaction.  The Proxy Statement omits certain material information concerning the

---

[6] *High-Dividend Stock Yields 12% Strong Growth, Selling Below Book Value*, SEEKING ALPHA (March 19, 2017),    https://seekingalpha.com/article/4056097-high-dividend-stock-yields-12-percent-strong-growth-selling-book-value.
[7] *Is Arc Logistics a Great Stock for Value Investors?*, ZACKS INVESTMENT RESEARCH (April 17, 2017), https://www.zacks.com/stock/news/256526/is-arc-logistics-a-great-stock-for-value-investors.

fairness of the Proposed Transaction and Merger Consideration.  Without such information, Arc Logistics common unitholders cannot make a fully informed decision concerning whether or not to vote in favor of the Proposed Transaction.

37.    The Individual Defendants were obligated to carefully review the Proxy Statement before it was filed with the SEC and disseminated to the Company's common unitholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy Statement misrepresents and/or omits material information, in violation of Sections 14(a) and 20(a) of the Exchange Act, that is necessary for the Company's common unitholders to make an informed decision concerning whether to vote their shares in favor of the Proposed Transaction.

38.    First, the Proxy Statement fails to present non-GAAP reconciliation for the financial projections that were conducted by TPH for the years 2017 through 2020.  *See* Proxy Statement 70-75.  Specifically, the Proxy Statement provides projections for non-GAAP (generally accepted accounting principles) metrics, including Adjusted EBITDA, Distributable Cash Flow, and Unlevered Free Cash Flows[8], but fails to provide line item projections for metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures.

39.    When a company discloses non-GAAP financial measures in a Proxy Statement, the Company must also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method), of the differences between the non-GAAP financial measure disclosed or

---

[8] Unlevered free cash flows are used to determine a company's enterprise value.  The unlevered free cash flow allows investors to ascertain the operating value of a company independent of its capital structure. This provides a greater degree of analytical flexibility and allows for a clearer picture of the value of the company overall.  For this reason, unlevered free cash flows are routinely used to value a company, especially in merger contexts

released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.

40.    At the very least, the Company must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP measures, including Adjusted EBITDA, Distributable Cash Flow, and Unlevered Free Cash Flows.  Such projections are necessary to make the non-GAAP projections included in the Proxy Statement not materially incomplete and misleading.

41.    Furthermore, the Proxy Statement fails to provide definitions for *Adjusted* EBITDA and Unlevered Free Cash Flows for non-GAAP reconciliation and to enable Arc Logistics common unitholders to understand both non-GAAP measures.

42.    Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with public investors.  The former SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Arc Logistics has included in the Proxy Statement here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last

December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[9]

43.    The SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[10] Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[11]  One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

44.    The omissions from the above-referenced projections renders the financial projections included on pages 70-75 of the Proxy Statement materially incomplete and misleading. If a proxy statement discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.

---

[9] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

[10] *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[11] *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

45.    In order to make the projections included on pages 70-75 of the Proxy Statement materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

46.    With respect to TPH's *Discounted Cash Flow Analyses*, the Proxy Statement fails to disclose the following key components used in the analysis: (i) the inputs and assumptions underlying the selection of the equity discount rates ranging from 9.0% to 13.0%; (ii) the inputs and assumptions underlying the selection of the forward distributable cash flow multiples ranging from 7.0x to 9.0x; (iii) the inputs and assumptions underlying the selection of the terminal yields ranging from 12.5% to 8.5%; (iv) the inputs and assumptions underlying the selection of the unlevered discount rates ranging from 7.0% to 10.0%; and (v) the inputs and assumptions underlying the selection of the forward EBITDA multiples ranging from 8.5x to 10.5x. *See* Proxy Statement 68.

47.    These key inputs are material to Arc Logistics common unitholders, and their omission renders the summary of TPH's *Discounted Cash Flow Analyses* incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can
> markedly affect the discounted cash flow value. For example, a change in the
> discount rate by one percent on a stream of cash flows in the billions of dollars
> can change the discounted cash flow value by tens if not hundreds of millions

*of dollars*….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion <u>unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices</u>.* The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.  *Id.* at 1577-78.

48.     With respect to TPH *Corporate Transactions Analyses*, the Proxy Statement fails to disclose the individual ratios TPH calculated for each of the 32 selected comparable transactions used.  *See* Proxy Statement 66-67.  A fair summary of these analyses requires the disclosure of the individual multiples for each transaction utilized.  Merely providing the median ratio and the range of ratios that a banker applied to render an Implied Price per Common Unit range is insufficient, as common unitholders are unable to assess whether the banker applied appropriate multiples or, instead, applied unreasonably low multiples in order to drive down the implied valuation of the Company.  The omission of the individual values for each selected comparable transaction renders the summary of this analysis set forth on pages 66 through 67 of the Proxy Statement materially incomplete and misleading.

49.     Likewise, the *Premium Paid Analysis* fails to disclose the individual premiums paid for an unknown number of all-cash acquisitions that TPH utilized in this analysis.  *See* Proxy Statement 68-69.  A fair summary of the premiums paid requires the disclosure of the identity of each of the all-cash acquisitions utilized and their respective premiums for the last trading day ("1-Day Premiums") and average trading price over the 30 days ("30-Day Premiums") before announcement of the applicable transaction.  Merely providing the median 1-Day Premiums and 30-Day Premiums for an entirely unknown number of transactions renders the analyses materially incomplete, as common unitholders are unable to assess whether the banker improperly utilized

certain transactions while excluding others and, as a result, drive down the implied valuation of the Company.  The omission of the identity of the individual transactions and their respective 1-Day Premiums and 30-Day Premiums renders the summary of the *Premium Paid Analysis* materially incomplete and misleading.  *See* Proxy Statement 68-69.

50.     Moreover, the Proxy Statement states that on December 1, 2015, Zenith, Lightfoot, and Arc Logistics entered into a confidential, non-binding term sheet.  Proxy Statement 32.  "The term sheet set out expectations regarding certain other terms, including *requirements for certain senior members of MLP GP management to enter into employment agreements with Zenith* at closing."  *Id.* (emphasis added).  However, the Proxy Statement fails to disclose whether this requirement or any other communications concerning post-close employment for any of Arc Logistic's officers and directors that took place during the negotiation of the Proposed Transaction.  This information is necessary for Arc Logistic common unitholders to understand potential conflicts of interests of the Board and Company management, as such information may prevent these individuals from observing their fiduciary duties and acting solely in the best interest of Arc Logistic and its common unitholders.

51.     With respect to the *General* section, TPH discusses the analyses it prepared for the purposes of providing a fairness opinion to the Board.  However, the Proxy Statement fails to disclose material information necessary for Arc Logistics common unitholders: TPH's prior dealings and corresponding compensation.  *See* Proxy Statement 69-70.  The omission of this information prevents Arc Logistics common unitholders from assessing the significance of the conflict of interest that TPH faced as a result of the financial advisory services it has provided to

Arc Logistics, certain equityholders, and affiliates of the parties to the Proposed Transaction and other related transactions.[12]

52.    Finally, the *Background of the Merger* states that Arc Logistics entered into confidentiality agreements with several companies, including agreements with Company A in November 2015, Company B in June 2016 and December 2016, and Company C in October 2016. *See* Proxy Statement 33-38.

53.    However, the Proxy Statement fails to disclose whether the confidentiality agreements with Company A, Company B, and Company C contained standstill provisions, how long the standstill provisions remained in effect, and if it would prevent Company A and Company C from submitting superior offers to acquire Arc Logistics.

54.    Moreover, with respect to the confidentiality agreement entered into on December 28, 2016, with Company B, the Proxy Statement fails to disclose whether the agreement contained a "Don't Ask Don't Waive" provisions and/or whether the standstill clause was terminated once Arc Logistics and Zenith entered into the Merger Agreement.    Proxy Statement 37.    This information is materially to Arc Logistics common unitholders because a "Don't Ask Don't Waive" provisions would prevent Company B from coming forward with a superior offer to the Proposed Transaction.

55.    In sum, the omission of the above-referenced information renders statements in the Proxy Statement materially incomplete and misleading in contravention of the Exchange Act.

---

[12] In connection with the Proposed Transaction, (i) Zenith Energy U.S. Logistics Holdings, LLC ("Zenith Holdings") will be acquiring Lightfoot's interest in Arc Logistics and Arc Logistics GP, (ii) Zenith Holdings will purchase 57% of Lightfoot LP's 9.678% interest in Gulf LNG Holdings Group, LLC ("Gulf LNG") and, subject to a favorable outcome in the arbitration dispute involving Gulf LNG, the remaining 43% of Lightfoot LP's remaining 43% interest in Gulf LNG, and (iii) Lightfoot will purchase a 2.5% interest in Arc Terminals Joliet Holdings LLC from EFS Midstream Holdings LLC.

Absent disclosure of the foregoing material information prior to the expiration of the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

56.     Therefore, Defendants have violated the Exchange Act and rules promulgated thereunder.

57.     Unless Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, to the irreparable harm of the members of the Class.

58.     Based on the foregoing disclosure deficiencies in the Proxy Statement, Plaintiff seeks injunctive relief and other equitable relief to prevent the irreparable injury that Arc Logistics common unitholders will suffer if they are required to vote on the Proposed Transaction without the above-referenced material misstatements and omissions being remedied.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)**

59.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

60.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or

authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

61.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

62.    SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement.  The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading*."  17 C.F.R. § 244.100(b).  The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).  As set forth above, the Proxy Statement omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

63.    The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

64.    Defendants have issued the Proxy Statement with the intention of soliciting common unitholders support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement, which fails to provide critical information

regarding, amongst other things: (i) financial projections for the Company; and (ii) the valuation analyses performed by TPH.

65.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy Statement, but nonetheless failed to obtain and disclose such information to common unitholders although they could have done so without extraordinary effort.

66.     The Individual Defendants knew or were negligent in not knowing that the Proxy Statement is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy Statement states that TPH reviewed and discussed their financial analyses with the GP Conflicts Committee, and further states that the Board considered both the financial analyses provided by TPH as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy Statement, rendering the sections of the Proxy Statement identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to review TPH's analyses in connection with their receipt of the fairness opinions,

question TPH as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

67.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

68.    Arc Logistics is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy Statement.

69.    The misrepresentations and omissions in the Proxy Statement are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **COUNT II**

### **(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

70.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

71.    The Individual Defendants acted as controlling persons of Arc Logistics within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Arc Logistics, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

72.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

73.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

74.    In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

75.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

76.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

77.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the common unitholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy Statement;

C.     Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


DATED:  October 4, 2017

<div style="margin-left:50%">

**MONTEVERDE & ASSOCIATES PC**

*/s/ Juan E. Monteverde*
_____
Juan E. Monteverde    JM-8169
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel.: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Counsel for Plaintiff*

</div>